185 So.2d 405

**DRENNEN MOTOR COMPANY, Inc.**

**v.**

**STATE of Alabama.**

**6 Div. 28.**

Supreme Court of Alabama.

April 15, 1966.

Moore, Thomas, Taliaferro, Forman & Burr, Birmingham, for appellant.

Richmond M. Flowers, Atty. Gen., Willard W. Livingston and Herbert I. Burson, Asst. Attys. Gen., for appellee.

COLEMAN, Justice.

The State Department of Revenue made an assessment against taxpayer, an automobile retailer, for sales tax claimed to be due for the period from March 1, 1958, through March 31, 1961. The assessment is dated June 5, 1961. Taxpayer appealed to the circuit court as provided by Title 51, § 140, Code 1940. The circuit court affirmed the assessment and taxpayer has appealed from the decree of the circuit court.

On the trial, the substance of the issue tried was stated by counsel for taxpayer and agreed to by the state as follows:

"This assessment . . . . arises out of a claim by the Department of Revenue that . . . . new automobiles are used . . . . as demonstrators and that the using of an automobile as a demonstrator constitutes a withdrawal or consumption or use . . . . so as to make that a taxable event even though later on that demonstrator is sold at retail as a new automobile and the tax is collected from that purchaser of the automobile."

The question for decision is whether the designation and use of new automobiles as demonstrators, followed by the sale of such demonstrators, as shown by the facts in this case, constitutes a taxable event under the definitions of gross proceeds of sales set out in Act No. 100, Acts of Alabama 1959, Vol. 1, page 298, § 1(f) (h) (j) (*l*); see Pocket Parts, 1958 Recompilation of Code of 1940, Title 51, § 786(2) (1) (f) (h) (j) (*l*).

Act No. 100 levies on every person engaged in selling at retail any automotive vehicle a tax equal to one and one-half per cent of the gross proceeds of the sale of such vehicle. Section 2(d).

The term, gross proceeds of sales, is defined in Act No. 100 to "include the reasonable and fair market value of any tangible personal property previously purchased at wholesale which is withdrawn or used from the business or stock and used or consumed in connection with said business, and shall also . . . . include the . . . . value of any tangible personal property previously purchased at wholesale which is withdrawn from the business or stock and used or consumed by any person so withdrawing the same. . . ." Section 1(f).

■ The facts are without dispute in any material respect.

"The presumption traditionally indulged in favor of the trial court's finding of fact is inapplicable where there is no substantial conflict in the evidence. —State v. Mobile Stove & Pulley Manufacturing Co., 255 Ala. 617, 52 So.2d 693; Alabama Farm Bureau Mut. [Casualty] Ins. Co. v. Mills, 271 Ala. 192, 123

So.2d 138." State v. Kershaw Manufacturing Company, 273 Ala. 215, 218, 137 So.2d 740, 743.

Pertinent testimony is as follows:

The assessment included Buicks, Chevrolets, and Cadillacs which had been designated as demonstrators. The practices of taxpayer are substantially the same for all three makes. Every car, the value of which the state seeks to include in gross proceeds as tangible personal property withdrawn from stock and used or consumed in the business, has been sold and the sales tax collected and paid to the state. The state, by the instant assessment, seeks to collect another tax on the value of these same cars on the theory that the prior designation and use of these cars as demonstrators constituted a taxable event.

Taxpayer's Buick Sales Manager testified that in accomplishing the sale of automobiles, taxpayer employs salesmen, shows new automobiles, and allows prospective customers to drive new automobiles which are offered for sale; most often cars are driven before they are bought; for the customers to be able to drive a car before purchase is most helpful in effecting sales and is necessary to effect sales in most cases.

The Sales Manager further testified that when new cars are received, they are left on the storage lot until they are "road-checked" and any deficiency corrected. The cars are then cleaned up and placed on the showroom floor or in the warehouse. As soon as a car comes in it is available for sale.

Taxpayer does not order any cars as demonstrators but orders "the allotment" and if there are any duplications in models or colors, then it would be best to designate one of the duplicates as a demonstrator. Cars which are used as demonstrators are available for sale immediately and are retained in taxpayer's new car inventory. A demonstrator is available for sale at all times.

At the time new models are announced cars are fairly short and taxpayer designates only two or three (Buicks) as demonstrators. Frequently, on announcement day at nine o'clock in the morning, taxpayer designates a car as a demonstrator and by noon it is sold.

After the opening date, taxpayer generally has eight or ten Buick demonstrators. A car that has been a demonstrator can be and is from time to time put back on the floor or in the warehouse. If a demonstrator has not been sold when it has several thousand miles on it, taxpayer will withdraw the car from being a demonstrator by putting it on the showroom floor and leaving the car there until it is sold.

All cars are demonstrators in some fashion such as customers sitting in the car and adjusting the power seat or raising the power windows or things like that on floor models. Prospective customers are frequently permitted to take a floor model off the floor and drive it around the block, which is helpful in effecting a retail sale of an automobile. Taxpayer could not sell cars if customers were not allowed to do this.

Taxpayer has sometimes had a car to sit on the floor for two or three months, but tries to avoid this. If taxpayer has had a car for several months, the car is discounted to move it out of inventory.

When a demonstrator is sold to a customer, taxpayer gives the same warranty as taxpayer gives on a new car. Demonstrators are carried on taxpayer's books in the new car inventory, are listed as a current asset, and are not depreciated.

Taxpayer has two courtesy cars used to take customers over to town when they leave their cars for service, to make runs to the bank, and for general company business. These courtesy cars are carried on the books as fixed assets and are depreciated; as soon as they are placed in service, they are billed to taxpayer and sales tax is paid on them.

Demonstrators are used for carrying service customers only as a convenience. If a salesman had a customer he had sold or a prospect, and the customer or prospect is stranded, on occasions the salesman will take the prospect to town, but demonstrators are not normally used for that. Demonstrators are not used to run company errands such as going to the bank.

Taxpayer has some customers who prefer to buy demonstrators rather than an unused car. The advantage of buying a demonstrator is that a demonstrator is worth exactly the same as a new car three years from now, but the customer is able to get a current model with a new car warranty and does not have to bother to bring it back for minor adjustments and littles defects which have already been taken care of.

Normally, taxpayer tries to keep 70 or 80 new Buicks on hand and would have about eight on the floor, and eight or ten demonstrators available to be driven. All the units taxpayer has on hand are available to be driven if the customer wants to drive them, even those in the warehouse.

The demonstrators are never leased or rented or used for anything other than to accomplish a retail sale of a Buick automobile. The only purpose of a demonstrator is to sell new automobiles.

Very few new cars are sold at the factory suggested list price. Almost all new cars, during the period involved in the instant assessment, have been sold at a discount, whether the car came straight from the factory to a customer or was in the warehouse or showroom or had been used as a demonstrator.

Not infrequently, a demonstrator will sell for more than a comparable new car. The witness has made a table of the thirty-three Buick demonstrator automobiles involved in the assessment and has compared the prices for which they sold with the prices at which comparable new cars, which had not been used as demonstrators, sold

for during the same period. The table or chart shows that the new cars, on the average, sold for 84.3 per cent of the list price and the thirty-three demonstrators, on average, sold for 79.8 per cent of the list price, a difference of 4.5 per cent.

Every car taxpayer has "in stock is available to be driven and frequently they are driven." Very infrequently, taxpayer permits prospective customers to take new cars home for the weekend. Sometimes, taxpayer permits them to take demonstrators home for the weekend.

Taxpayer normally has 60 to 80 Buicks, 130 to 140 Chevrolets, and less Cadillacs than Buicks. The designation of a car as a demonstrator in the morning and its sale in the afternoon of the same day is not rare or unusual during the first week or ten days after new models are announced. Such designation and sale on the same day would be more rare later on but it does happen.

Taxpayer has six Buick salesmen. Each car designated as a demonstrator is assigned to a salesman who drives it during the business day. Taxpayer's showroom is frequently open until nine o'clock at night, and frequently the salesmen have appointments at night. They carry the demonstrators home and then bring them back. "The cars are there all day and except when being demonstrated are available for sale." The salesman uses the demonstrator as transportation to and from his home.

Taxpayer finds that by having complete control and maintenance of the demonstrators, there is not really a great difference between the selling price of demonstrators and new cars not designated as demonstrators.

Taxpayer has an inventory card on each new car in stock and keeps a record book on each new car. That is true when a car is designated as a demonstrator. The day of service is recorded so that Buick will honor its warranty. The use of a car as a dem-

onstrator for nine months is a little unusual, but two and a half to four months would be the average.

Taxpayer made a change in its demonstrator policy in the fall of 1957. Prior to the change, taxpayer sold cars to salesmen at cost. The salesmen owned the cars personally and sales tax was paid. Taxpayer found that salesmen, in owning their cars, were leaving them at home for their wives and were not using them for demonstration and selling. Taxpayer had no control over the cars. For these reasons, taxpayer decided to designate new cars as demonstrators, keep them in new car inventory, sell them as new cars, and have complete control.

Sales are frequently made by salesmen at night from the homes of customers. The availability of the demonstrator at the home of the customer is desirable and helpful in effecting a retail sale.

The examiner who made the audit here involved testified for the state. He testified that Regulation A28–061, of the Department of Revenue, prior to October 1, 1959, recited as follows:

> " 'Demonstrators, automotive. Use of Automotive Vehicles as Demonstrators by automobile dealers constitutes taxable withdrawal from stock of such vehicle. When vehicle so withdrawn is returned to stock as a used vehicle the sales thereof will not be subject to sales tax.' "

The old regulation was based on the sales tax law which did not tax the sale of used vehicles.

Since October 1, 1959, Regulation A28–061 recites as follows:

> " 'Demonstrators, Automotive. Use of automotive vehicles as demonstrators by automobile dealers constitutes a taxable withdrawal from stock of such vehicle. When vehicle so withdrawn is returned to stock as a used vehicle the sale thereof will be subject to sales tax.' "

The witness was guided by these two regulations when he made the audit here involved.

Taxpayer makes report to the automobile manufacturer every ten days. On this report is shown the automobiles in stock and certain of the automobiles shown on the report are called demonstrators. If a car appeared one time as a demonstrator, the witness did not "call it a demonstrator," and did not call it a demonstrator "unless it appeared on several reports."

The witness has made a schedule for eight automobiles which were shown as demonstrators on the ten-day reports. The schedule shows the number of reports on which each of the eight cars appeared as a demonstrator. The number of days a car was shown as a demonstrator is calculated by multiplying the number of reports by ten. One car is shown as a demonstrator for 300 days, one for 150 days, three for 120 days, and one each for 80, 50, and 40 days respectively. The method the examiner used in selecting the eight cars is not shown.

As we understand the record, on cross-examination, the examiner testified that the instant assessment does not list any demonstrator as subject to tax prior to October 1, 1959. The first sentence of the regulation, that use of automotive vehicles as demonstrators constitutes a taxable withdrawal, was the same prior to October 1, 1959, as after October 1, 1959.

The following appears in the examination of the witness:

"Q You made no attempt to make any assessment on cars designated as demonstrators prior to October 1, 1959?

"A Yes, sir, I made an attempt but I found out there was no liability there since they sold them to the salesmen and charged the tax and remitted it to the State.

"Q Isn't it a fact, Mr. Anderson, you made no attempt to make an assess-

ment prior to that time because if you made an assessment on demonstrators, the Department makes an assessment on demonstrators at the time it is designated as a demonstrator and then the Department considers it a used car when put back in stock and not subject to tax as a new car but rather as a used car, is that correct?

"A Prior to October 1, 1959?

"Q Yes.

"A Yes, sir, that is right.

"Q There was no tax on used cars prior to October 1, 1959?

"A That is correct."

The witness further testified that the designation of a car as a demonstrator was not, in his opinion a taxable event; that such a designation, followed by a single demonstration, is not a taxable event; that if a car is used one full day as a demonstrator and sold the next day, in theory, but not in practice, the designation would be a taxable event; that the witness would consider anything over two weeks as a demonstrator as being substantial use; that there is no warranty in law for the two-weeks criterion; that the market value is not pertinent in establishing tax liability; that the opinion of the witness is his individual opinion; that he is given some leeway and allowed to use his own judgment and in this instance the opinion expressed is his own opinion and not the Department's opinion as far as he knows, and he does not know whether any other examiner would follow that practice.

As we understand the case, no assessment, for sales tax, had ever been made against taxpayer based on the designation or use of an automobile as a demonstrator prior to October 1, 1959. Prior to that date, no sales tax was due from a retailer selling a used car which the retailer had acquired as part of the consideration for the sale of a new car; Code 1940, Title 51, § 753(d), as amended by Act No. 121,

1951 Acts, page 348; but on October 1, 1959, Act No. 100, 1959 Acts, page 298, supra,' became effective and a sales tax became due on the sale of a used car. This change of the law appears to be the cause of the change in Regulation A28–061, supra.

The decree of the trial court indicates that the court relied on Regulation A28–061 in deciding this case. The state now relies on this regulation and invokes the rule that an administrative statutory interpretation of long standing is entitled to consideration and weight in the interpretation and construction of the statute.

 We do not think, however, that such administrative interpretation is entitled to any considerable weight when the interpretation has recently been changed in a material particular, as is the case here. It is true that the first sentence is substantially unchanged, but the second sentence is now diametrically opposed to its former language. The negative has become the positive. We do not think it enough to say that the second sentence was changed because the law was changed as to taxing used car sales. As we understand the evidence in this case, the departmental practice with respect to this taxpayer, as well as the regulation, has changed since October 1, 1959. The audit period is from March 1, 1958, through March 31, 1961. It began more than a year before October 1, 1959, but no assessment as to demonstrators was made before that date. The examiner accounts for this by stating that it was his information that taxpayer's salesmen owned the demonstrators prior to October 1, 1959, but, at that time, taxpayer had not sold demonstrators to its salesmen for two years, according to the positive testimony of taxpayer's Sales Manager. A regulation not followed does not, as it seems to us, require that weight be given to it as an administrative interpretation.

Even if, however, the regulation should be entitled to weight as an administrative interpretation, we are not persuaded that it should control in this case.

"In reaching this conclusion, we are not unmindful of the argument that the administrative construction accorded the subsection in the past as being restricted to farmers, is entitled to favorable consideration by the court, (Citations Omitted). Yet this rule of construction is to be laid aside where it seems reasonably certain that the administrator's interpretation has been erroneous and that a different construction is required by the language of the act. (Citations Omitted.)" State v. Wertheimer Bag Co., 253 Ala. 124, 128, 43 So.2d 824, 827.

See: First National Bank of Mobile v. Watters, 201 Ala. 670, 79 So. 242; and Hamm v. Continental Gin Co., 276 Ala. 611, 165 So.2d 392.

We are persuaded that the designation and use of the automobiles as demonstrators, as shown by the testimony in this case, was not such a withdrawal and use as makes the withdrawal or the use, or both together, a taxable event.

In construing a prior statute where a tax was imposed on a "withdrawal, use or consumption" of tangible personal property, this court said:

"It is clear that Subdivision (j), § 752, was enacted to reach transactions which could not be taxed because there was a withdrawal and use or consumption by the purchaser at wholesale but no sale by him to another. (Citations Omitted.)" State v. Kershaw Manufacturing Company, 273 Ala. 215, 217, 137 So.2d 740, 741.

■ The reason for such a taxation of a withdrawal or use is absent here because, as we understand the testimony, every car included in the instant assessment has been sold, sales tax collected, and payment of the tax made to the state. In the instant case, there is no lease as in Kershaw and no renting as in Montgomery Aviation Corp. v. State, 275 Ala. 266, 154 So.2d 24.

The testimony is uncontroverted that every demonstrator is available for sale at all times and ". . . . that is the only purpose of a demonstrator, to sell new automobiles." The demonstrators are retained in taxpayer's new car inventory. We do not think that the evidence shows that the demonstrators were "withdrawn . . . . from the . . . . stock" of taxpayer's new cars. It is true the demonstrators were used in the business of selling, but so was every other new car used, usually to a lesser degree. We are not persuaded that the language of the statute expresses an intention to tax, prior to the sale, the use of a piece of merchandise as a demonstrator when the merchandise remains in stock, is available at all times for sale, is used only to promote selling, and is, in every case without exception, sold, and the average selling price is approximately four and one-half per cent less than the average selling price of new merchandise which has not been used as a demonstrator.

Taxpayer argues that to tax the value of the car when designated as a demonstrator and then to tax the sale of the same car is to impose double taxation. This court has said:

"The presumption is against the intention of the legislature to impose double taxation on the same property. 61 C.J. sec. 71,—and prevails unless overcome by the express words of the statute. Any construction of a taxing statute which results in the taxation of the same property twice is to be avoided if possible and never to be adopted unless necessary to affect the manifest purpose of the legislature. (Citations Omitted.)" Paramount-Richards Theatres v. State, 256 Ala. 515, 529, 55 So.2d 812, 824.

The state points out that the tax is on the transaction, not on the property, and that the sales tax is imposed on the buyer, not the seller. This is substantially the same argument the state made in Mont-

gomery Aviation Corp. v. State, supra, where the court said:

"\. . . . Moreover, according to appellee's postulate there would be double taxation if appellant paid a 'withdrawal' tax, and then upon selling the plane collected and paid another." (275 Ala. at page 268, 154 So.2d at page 26.)

We are of opinion that the decree affirming the assessment is in error and should be reversed.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON and GOODWYN, JJ., concur.