PER CURIAM.
Southern States Police Benevolent Association, Inc. (“the SSPBA”), and three members of the SSPBA—Scott Kendall, Christopher Carver, and Patrick McCul-loch, all of whom are employed as police officers by the City of Auburn (hereinafter referred to collectively as “the Auburn police officers” or collectively with the SSPBA as “the police plaintiffs”)—sued Governor Robert H. Bentley and the other members of the Board of Control of the Employees’ Retirement System of Alabama (“the ERS”) (Governor Bentley and the other members of the Board of Control of the ERS are hereinafter referred to as “the ERSA”); David Bronner, the chief executive officer and secretary-treasurer of the Retirement Systems of Alabama (“the RSA”)[1] and the ERS;. and Thomas :L. White, Jr., the State comptroller (hereinafter referred to collectively as “the State defendants”),' in their representative capacities, in the Montgomery Circuit Court seeking injunctive relief and a judgment. *636 declaring that participants in the pension plan the ERSA operates could make retirement contributions—and therefore receive increased retirement benefits—based upon their “earnable compensation,” which term, the police plaintiffs argue, rightly includes payments received for overtime worked. The trial court entered a summary judgment in favor of the State defendants, and the police plaintiffs appeal. We affirm.
I.
The ERSA operates a defined-benefit pension plan (“the ERS plan”) established by the State of Alabama in 1945 to provide “retirement allowances and other benefits ... for employees of the State of Alabama.”[2] § 36-27-2, Ala. Code 1975. Participation in the ERS plan is mandatory for covered employees if they work at least 20 hours per week in a nontemporary position. These “members” must contribute a percentage of their “earnable compensation” to the ERS plan each pay period, and, upon retirement, they will receive monthly pension payments, the amount of which depends upon the number of years of “creditable service” completed by the member and upon the member’s “average final compensation.” See § 36-27-1, Ala. Code 1975 (defining the terms “member,” “earnable compensation,” “creditable service,” and “average final compensation”). The entity employing the member also makes a separate contribution to the ERS plan each pay period on behalf of the member.[3] Although participation in the ERS plan is mandatory for most members beginning from the date they start employment, a member does not become entitled to receive retirement benefits until he or she has accumulated 10 years of creditable service. Upon doing so, the member is said to be “vested,” and he or she is thereafter eligible to begin receiving retirement benefits when he or she retires after (1) accumulating 25 or 30 years of creditable service (depending upon the rules of the employing entity) or (2) reaching 60 years of age.[4]
Section 36-27-1(14), Ala. Code 1975, defines “earnable compensation” as “[t]he full rate of compensation that would be payable to an employee if he or she worked the full normal work-time.” In 1975, the State police requested that overtime payments be included in the calculation of their officers’ earnable compensation, and, in November 1975, the ERSA acceded to that request and adopted a policy whereby overtime payments were included in the earnable compensation of those members. Thereafter, in May 1978, *637 the ERSA implemented a policy whereby overtime payments and subsistence allowances [5] were included in earnable compensation for all members of the ERS plan. Accordingly, members made retirement contributions on those payments and allowances. When the Auburn police officers started their employment with the City of Auburn, they each began making retirement contributions based upon earnable compensation as defined by that policy, that is, they made contributions on both their base salary and on all overtime payments received.
Sometime in early 2011, White, the State comptroller, and Jackie Graham, the director of the State Personnel Department and a member of the Board of Control of the ERS, requested an advisory opinion from the Alabama Attorney General clarifying whether overtime payments and subsistence allowances were properly considered “earnable compensation” under § 36-27-1(14). On August 22, 2011, the attorney general issued an opinion answering both inquiries in the negative. With regard to overtime payments, the attorney general specifically stated:
“The [ERS], as set forth in § 36-27-1, et seq., [Ala. Code 1975], provides a defined-benefit plan for certain employees of the State of Alabama whose salary is paid by a state warrant. ... Specifically, [Ala. Code 1975,] § 36-27-24(b)[,] provides that ‘each employer shall cause to be deducted from the salary of each member on each and every payroll of such employer for each and every payroll period [a percentage] of his earnable compensation.’ ... (emphasis added). ‘“Earnable compensation’ is defined as ‘[t]he full rate of compensation that would be payable to an employee if he or she worked the full normal work-time. In cases where compensation- includes maintenance, the Board of Control shall fix the value of that part of the compensation not paid in money.’ Ala. Code [1975,] § 36-27-1(14) (2001) [ (emphasis added) ].
“The statutory provisions governing the [RSA] do not allow for contributions on extraordinary payments. See Mitchell v. Employees’ Retirement Sys. of Ala., 642 So.2d 480, 481 (Ala.1994) (disallowing retirement calculations on sick and annual leave payments). State law clearly provides that deductions for retirement shall be made from an employee’s salary. By definition, ‘overtime’ is not ‘salary.’

U

“Pursuant to state law,' the salary of each employee is based upon a semimonthly rate, regardless of the number of hours in the semi-monthly pay period. For example, during a calendar year, the semi-monthly pay period contains 72, 80, 88, and 96 work hours depending on the work days contained within each semi-monthly time period. Regardless, however, of the number of hours within the semi-monthly time period, an employee’s salary remains constant.
“Additionally, Rule 670-X-11-.01 and .04 of the Rules of the State Personnel Board establish uniform regulations for all employees under the State Merit System and requires the number of hours to be uniform for all employees whose positions are allocated to the same class, unless specifically provided otherwise by action of the Board. A ‘regular work week’ is described as a 40-hour work week. (A 40-hour week shall be used for the purpose of calculating *638 the pay of employees paid on a semimonthly basis.) Ala. Admin. Code [Personnel Board] r. 670-X-11-.01 and -.04 (eff. June 26, 2006). The State Personnel Board Rules, not in conflict with the laws of Alabama, have the force and effect of law. See Ala. Code [1975,] § 36-26-9 (2001). With respect to. state law enforcement officers, section 36-21-4 of .the Code specifically provides that a normal work week is a 40-hour week. Ala. Code [1975,] § 36-21-4 (2001).
“Therefore, based upon the foregoing, only the salary an individual is normally entitled to receive on a semi-monthly basis is ‘earnable compensation’ as that term is used in § 36-27-1(14). Overtime payments are not salary as that term is used in § 36-27-24(b), and may not be used . for retirement calculation purposes.”
Ala. Op. Att’y Gen. No. 2011,-090 (August 22,2011). For similar, reasons, the attorney general also concluded that subsistence allowances ■ were not “earnable compensation” for retirement purposes. Id.
In accordance with the' attorney general’s opinion, White stopped collecting from state employees retirement contributions. attributable to overtime payments or subsistence allowances, effective September 1, 2011. The RSA informed other entities participating in the ERS plan to do likewise, and the City of Auburn complied with that directive, stopping the collection of retirement contributions attributable to overtime payments received by the Auburn police officers as of that same date.[6] On February 6, 2012, the police plaintiffs initiated this action, challenging the ERSA’s decision to exclude overtime payments from a member’s earnable compensation and arguing that the State defendants had a contractual obligation to continue calculating members’ .earnable compensation in. the same manner the ERSA had for, approximately 36 years.[7] Before the trial court could rule, however, the legislature passed, a bill amending the definition of “earnable compensation” in § 36-27-1(14), effective May . 9, 2012. Specifically, a subsection b was added, which read as follows:
“b. The term earnable compensation for retirement purposes shall not include subsistence payments that are made to *639 an employee and shall include overtime payments that are made to an employee; however, earnable compensation shall not exceed 120 percent of any employee’s annual base compensation as certified by the employer.”[8]
Following the amendment of § 36-27-1(14), the State defendants adjusted their policies to comply with the amended statute, and the ERSA has since accepted retirement contributions attributable to overtime payments received by a member only to the extent that the member’s earnable compensation does not exceed 120% of his or her “annual base compensation,” which the ERSA interprets to mean base salary. In response to this legislative action, the police plaintiffs amended their complaint to challenge the ERSA’s application of amended § 36-27-1(14), arguing that the Auburn police officers’ “annual base compensation” should include pay received for mandatory overtime worked, not just base salary.
Thereafter, this case proceeded through the pretrial process, during which time it was consolidated with three other cases challenging the State defendants’ actions taken in response to both the August 2011 attorney general’s opinion and amended § 36-27-K14).[9] In May 2014, the police plaintiffs and the State defendants filed summary-judgment motions that, by agreement, addressed the rights of only those members who were vested in the ERS plan when the treatment of overtime payments changed in September 2011.[10] After the requisite responses, replies, and supplements were filed, and after two hearings at which the arguments raised by the parties were considered, the trial court on October 30, 2015, entered a summary judgment in favor of the State defendants, holding' that they were entitled to the State immunity provided by Art. I, § 14, Ala. Const. 1901, and that the police plaintiffs’ claims were accordingly barred.
The police plaintiffs thereafter moved the trial court to reconsider its judgment or, in the alternative, to enter a final judgment as to the claims of non-vested members so that the police plaintiffs could pursue an immediate appeal. Before the trial court ruled on that motion, however, the police plaintiffs filed a notice of appeal to this Court (appeal no. 1150265). On December 15, 2015, this Court remanded the cause to the trial court as being from a nonfinal judgment because the claims of non-vested members remained pending, and, on December 29, 2015, the trial court entered an order holding that the State defendants were entitled to a summary judgment on those claims as well. On January 6, 2016, the police plaintiffs, out of an abundance of caution, filed another notice of appeal to this Court (appeal no. 1150360), and we consolidated the two appeals for the purpose of writing one opinion.
II.
The police plaintiffs seek review of the summary judgment entered in favor of the State defendants on the basis of *640 their alleged immunity. Specifically, the police plaintiffs argue that State immunity does not apply and that a judgment as a matter of law should, in fact, be entered in their favor because, they allege, the State defendants have misinterpreted § 36-27-1(14) and have violated the contractual rights of the members of the ERS plan, which rights, they argue, are protected by Art. I, § 22, Ala. Const. 1901, (1) by changing the ERSA’s longtime policy following the issuance of the August 2011 attorney general’s opinion and preventing members from making any further retirement contributions based on overtime payments and (2) by changing the ERSA’s policy again after the legislature amended § 36-27-1(14) and allowing members to make retirement contributions attributable only to some overtime payments. These issues—State immunity and constitutional and statutory interpretation—are all issues of law and are accordingly reviewed de novo by this Court. See, e.g., Pitts v. Gangi, 896 So.2d 433, 434 (Ala.2004) (“We review questions of statutory construction and interpretation de novo .... ”), and Ex parte Franklin Cty. Dep’t of Human Res., 674 So.2d 1277, 1280 (Ala.1996) (Cook, J., concurring specially) (“Alabama recognizes absolute immunity, commonly presented with regard to State agencies or public employees, granted under Art. I, § 14, Alabama Constitution of 1901, and qualified immunity, commonly referred to as discretionary-function immunity [i.e., State-agent immunity]. This Court has held that the question of immunity is a question of law for the courts to decide.”).
III.
This Court generally considers State-immunity arguments before considering other issues that might be raised on appeal because resolution of an immunity claim may obviate the need to address other issues. See, e.g., Alabama State Univ. v. Danley, 212 So.3d 112, 121 (Ala.2016) (‘We first address [the appellants’] arguments that they are entitled to immunity from the judgment because, if that issue is decided in their favor, the other issues they raise are moot.”). In this case, the State defendants are all State officials sued in their representative capacities; accordingly, unless one of the “exceptions” to State immunity applies, they are entitled to the immunity from suit granted the State by § 14 of the Alabama Constitution, which provides “[t]hat the State of Alabama shall never be made a defendant in any court of law or equity.” See Lyons v. River Road Constr., Inc., 858 So.2d 257, 261 (Ala.2003) (holding that the State, its agencies, and State officials sued in their representative capacities may claim the State immunity provided by § 14).
This Court, however, has held that certain actions against State officials being sued in their representative capacity are not barred by § 14. Those actions include: (1) actions brought to compel State officials to perform their legal duties; (2) actions brought to enjoin State officials from enforcing an unconstitutional law; (3) actions to compel State officials to perform ministerial acts; (4) actions brought under the Declaratory Judgments Act, § 6-6-220 et seq., Ala. Code 1975, seeking construction of a statute and its application in a given situation; (5) valid inverse-condemnation actions; and (6) actions seeking in-junctive relief where it is alleged that State officials have acted fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law. Ex parte Hampton, 189 So.3d 14, 17-18 (Ala.2015). The police plaintiffs argue that then-action falls within the second, fourth, and/or sixth of these categories and that the trial court accordingly erred by concluding that the action was barred by § 14. *641 Essentially, they argue that the State defendants have misinterpreted the terms “earnable compensation” and “annual base compensation” in § 36-27-1(14) and have applied that mistaken interpretation in an unconstitutional manner, and they now ask this Court to interpret the statute properly and to instruct the State defendants to act in accordance with that definition.
To the extent the police plaintiffs have requested a declaratory judgment interpreting § 36-27-1(14), that claim appears to fall within the fourth category of actions not barred by § 14. Whether the State defendants have applied § 36-27-1(14) in a manner that effectively renders it unconstitutional or have otherwise misinterpreted it so as to bring this action within the second and sixth of those categories as well can only be determined once we have set forth the proper interpretation of § 36-27-1(14), which we do in the context of the request for a declaratory judgment. We accordingly begin by examining § 36-27-1(14) and the State defendants’ interpretation and application of that statute before the legislature amended it in 2012, after which we consider the State defendants’ interpretation of § 36-27-1(14) subsequent to the legislature’s amendment of the statute.
Section 36-27-1(14) provides that “earnable compensation” is “[t]he full rate of compensation that would be payable to an employee if he or she worked the full normal work-time.” The August 2011 attorney general’s opinion, quoted supra, concluded that “only the salary an individual is normally entitled. to receive on a semi-monthly basis is earnable compensation.” We find the analysis leading to that conclusion to be sound, and we adopt the rationale in the attorney general’s opinion. An employee’s designated salary necessarily compensates him or her for his or her “full normal work-time.” Any work performed in excess of that “full normal work-time” is, by definition, overtime. Any such overtime is compensated with additional payments' that are not part of the employee’s salary, and those additional overtime payments cannot be considered “earnable compensation” inasmuch as the payments are compensation for work performed beyond the “full normal work-time”—otherwise no additional payment would be due. Thus, when the State defendants stopped allowing members to make retirement contributions on overtime payments following the issuance bf the attorney general’s opinion in August 2011, they were not acting pursuant to a mistaken interpretation of § 36-27-1(14). To the contrary, it was the first time in approximately’36 years that § 36-27-1(14) was being interpreted and applied correctly. ,
We further note that the State defendants’ -application of § 36-27-1(14) in compliance with the attorney general’s opinion is not.unconstitutional. The police plaintiffs emphasize that Officers Kendall and McCulloch were vested members in the ERS plan at the time of the September 2011 policy change, and the police plaintiffs accordingly argue that those officers and other similarly situated members held certain contractual rights at that time— including the right to continue making retirement contributions on overtime payments—by virtue of their vested status. Therefore, the police plaintiffs argue, the actions of the State defendants preventing Officers Kendall and McCulloch from continuing,to, make those retirement contributions interferes with their contractual right to do so in violation of § 22, Ala. Const. 1901, which provides “[t]hat no ex post facto law, nor any law, impairing the obligations of contracts ... shall be passed by the legislature.”
In support of their argument, the police plaintiffs urge this Court to adopt what *642 they term “the Tennessee rule,” which the Supreme Court of Tennessee adopted in Blackwell v. Quarterly County Court of Shelby County, 622 S.W.2d 535 (Tenn.1981), when it .considered whether a county pension system could legally change the manner in which an employee’s final average compensation was calculated, even if the new formula might result in a reduced pension for certain vested employees.[11] In concluding that such a change was not lawful, the Blackwell court recognized that, “[a]t some point after an employee has performed services or has paid into a pension and retirement plan, he acquires fixed and immutable rights in the system.” 622 S.W.2d at 540. Accordingly, the Blackwell court concluded that vested employees had a right to continue having their final average compensation computed under the previous formula, stating “[w]e do not believe that this right should be or that it could validly be taken from them without their consent, even though they continued to be employed by the county and to accrue benefits in the future.” 622 S.W.2d at 543. See also Roberts v. Tennessee Consol. Ret. Sys., 622 S.W.2d 544, 545 (Tenn.1981) (applying the Tennessee rule and concluding that' the government'may modify a public pension plan when modification is reasonably required to 'keep the plan fiscally sound even if those changes have an adverse impact on members of the plan; however, no such modification can adversely affect a vested member).
The police plaintiffs also cite cases from this Court in which we recognized that participants in a public pension plan have at least some contractually vested rights. For example, in Smith v. City of Dothan, 279 Ala. 571, 188 So.2d 532 (1966), the appellant voluntarily chose to participate in a municipal pension plan to which he contributed five percent of his salary. Subsequent to his becoming vested in the plan and reaching retirement eligibility, the legislature amended the plan to limit contributions to the first $4,800 of salary. When he subsequently retired, he sued the municipality, seeking the increased benefit he would have been entitled to if the cap had not been placed on his contributions and offering to pay the contributions he had been prevented from making previously. In ruling in the appellant’s favor, the Smith Court stated:
“A controlling question presented for our decision is whether under the agreed facts of this case appellant acquired a vested right of contract to pension benefits provided by. law in effect at the time the [act amending the pension plan] was passed and approved. In other words, are. appellant’s rights to a retirement or pension determinable, under [the act creating the pension plan], free of the amendment impressed by . [the subsequent act]?
“The Constitution of the United States, § 10, Article 1, provides that no state shall pass any law impairing the obligations, of contracts, while our Alabama Constitution, Article 1, § 22, provides: ‘That no ex post facto law, nor any law, impairing the obligations of contracts ... shall be passed by the legislature.’
“It is settled law that § 22, Article 1 of the Constitution of 1901 does not simply inhibit the State from impairing *643 the obligations of contracts between individuals, but applies with like force and effect to contracts made by the State or with one of its agencies when authorized by law. ...
“It is our opinion in the instant case, under the agreed statement of facts, that appellant, upon reaching eligibility for retirement in 1959, acquired a vested right to the benefits provided by [the act creating the pension plan] free of the amendatory effect of [the subsequent act].
“Appellant voluntarily identified his employment tenure with the pension or retirement plan created by [the act creating the pension plan]. Although he was not actually paid the deductible sums which constituted his contribution to the retirement fund, his voluntary identification with this program created by [the act creating the pension plan] had the legal effect of his having received his full salary and returning a part to the City to meet his share of the contribution to the retirement fund. The deducted sum belonged to him and was withheld through his agency and agreement; it retained the attribute of appellant’s private property until paid into the benefit fund. [The subsequent amendment] as applied to appellant in the instant case impaired appellant’s contract with the City in violation of the constitutional provisions, supra.
“We pretermit any pronouncement as to the effect of these constitutional provisions . where the employee has not reached eligibility for retirement. That situation.does not obtain in the present case and is not before us.” .
279 Ala. at 574-76, 188 So.2d at 534-86. Similarly, in Snow v. Abernathy, 831 So.2d 626, 631 (Ala.1976), this Court held that an employee of the City of Tuscaloosa who had voluntarily elected to become a member of the ERS plan after its inception had a. contractual right to designate a beneficiary .upon his death that was not abrogated by subsequent legislation dictating that a member’s surviving spouse was automatically the member’s beneficiary, stating:
“It is voluntary participation at the election of the employee that precipitates vesting of contractual rights of that employee in the pension or retirement plan. In this case [the employee] made the voluntary election by executing a written instrument expressly assenting to membership in the [ERS plan]. This is not to say that such is the only method of expressing assent.
“Though management (or the legislature) may reserve the right to revise or amend the plan, vested rights of the employee may not be impaired and will be safeguarded. Weesner v. Electric Power Board of Chattanooga, 48 Tenn.App. 178, 344 S.W.2d 766 (1961).
“A basic determining factor to a resolution of the question of whether [the employee] acquired vested contractual rights in the statutory retirement plan here under consideration is contribution or noncontribution to the fund. [The employee]' contributed^] therefore weight is added to the soundly reasoned conclusion that the relationship between him and' the system was contractual in nature. His rights vested thereby and cannot be abrogated-by legislation although legislation to improve the system is constitutionally permissible. State ex rel. O’Donald v. City of Jacksonville Beach, [142 So.2d 349 (Fla.Dist.Ct.App.1962)]; Bardens v. Board of Trustees, of Judges Retirement System, 22 Ill.2d 56, 174 N.E.2d 168 [ (1961) ]; Clarke v. Ireland, 122 Mont. 191, 199 P.2d 965 [ (1948) ]; Ball v. Board of Trustees of Teachers’ *644 Retirement Fund, 71 N.J.L. 64, 58 A. 111 [ (1904) ].
“[The employee’s] contractually vested right was to receive all benefits ‘contracted’ for and included the power to designate his beneficiary. That right was provided by Act No. 515, Acts of Ala., 1945 [which established the ERS plan]; the basis of the contractual agreement at the time of [the employee’s] election to participate. By electing, expressly or by assent, to participate in such plan employees acquire vested rights of contract to the benefits provided therein upon acceptance of the plan. Those rights may not be impaired by subsequent legislation.”
Finally, the police plaintiffs also cite Board of Trustees of Policemen’s & Firemen’s Retirement Fund of Gadsden v. Cary, 373 So.2d 841, 842 (Ala.1979), in which this Court recognized that, although the Smith and Snow Courts had emphasized that the appellants in those cases had voluntarily decided to join their respective pension plans, participants in mandatory pension plans could also acquire vested contractual rights:
“The issue before this Court is whether persons subject to a compulsory pension system secure vested contractual rights immune from legislative change or an expectancy created by law subject to change or revocation by the enacting authority.
“Decisions of this Court have embraced the voluntary/mandatory dichotomy with respect to the vesting of pension rights in the context of public employment. It is clear that under voluntary retirement plans, certain rights vest and these rights cannot be abrogated. Snow v. Abernathy, 331 So.2d 626 (Ala.1976); Smith v. City of Dothan, 279 Ala. 571, 188 So.2d 532 (1966); City of Birmingham v. Penuel, 242 Ala. 167, 5 So.2d 723 (1942).
“This Court has never held, however, that a mandatory retirement plan for public employees precludes the vesting of certain rights in situations where the employee has fulfilled all of the prerequisites necessary to receive retirement benefits. We analogize this situation to a unilateral contract, where the promisee has completely performed all of the obligations and all conditions precedent so that the promisor has an unqualified duty to pay those obligations. We are of the opinion that subsequent legislative alteration is barred by Art. 1, § 22 of the Alabama Constitution of 1901.”
The Cary Court did hold, however, that those contractual rights vested only when the employee had completed the years of service required so as to be eligible to retire, stating:
“With respect to those employees who had not yet become eligible for retirement, we are constrained to hold that their interests had not matured into an unqualified right to receive the benefits set out in the statutory plan. We view the completion of twenty years’ service as a condition precedent to the vesting of an absolute right to receive these benefits. Therefore, absent this vesting, the compensatory scheme, including the retirement plan, was subject to legislative modification.”
373 So.2d at 843.
Thus, there is authority from this Court indicating that public employees participating in a pension plan may, at some point, acquire some vested contractual rights that cannot be taken away without their consent. Nevertheless, the State defendants argue that the cases cited by the police plaintiffs are distinguishable and do not establish that the change in the way the State defendants interpreted “eamable *645 compensation” following the August 2011 attorney general’s opinion is unconstitutional. The State defendants emphasize that the cases cited by the police plaintiffs were all decided before 1985, when the Supreme Court of the United States, in National R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry., 470 U.S. 451, 465-70, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985), developed the current standard for reviewing contract claims asserted against the government.[12] Under this standard, a statute will not be construed to contractually bind the government unless the statute evinces the legislature’s unmistakable intent to do so. In Taylor v. City of Gadsden, 767 F.3d 1124 (11th Cir.2014), the United States Court of Appeals for the Eleventh Circuit applied this standard when considering an action initiated by certain firefighter-employees of the City of Gadsden—who were members of the ERS plan—challenging Gadsden’s decision to raise their contribution rate by 2.5%. In rejecting this challenge, the Taylor court stated:
“Despite ample discovery, no party has produced the written agreement between the firefighter-employees and the City, nor is there much evidence about what the terms of such a writing might contain. We look instead to the statutory provisions that govern the ERS. When engaging in such a review, we must ‘proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.’ Nat’l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 466, 105 S.Ct. 1441, 1452, 84 L.Ed.2d 432 (1985). That is because ‘the principal function of the legislature is not to make contracts, but to make laws that establish the policy of the state’; after all, ‘[pjolicies, unlike contracts, are inherently subject to revision and repeal.’ Id. at 466, 105 S.Ct. at 1451. Unless the legislature evinces an ‘unmistakable’ intent to be contractually bound, United States v. Winstar, 518 U.S. 839, 860, 116 S.Ct. 2432, 2448, 135 L.Ed.2d 964 (1996) (plurality opinion), we presume ‘that statutory enactments do not create contractual obligations,’ McGrath v. R.I. Retirement Bd., 88 F.3d 12, 19 (1st Cir.1996); see also Winstar, 518 U.S. at 921, 116 S.Ct. at 2477 (Scalia, J., concurring) (‘Governments do not ordinarily agree to curtail their sovereign or legislative powers, and contracts must be interpreted in a commonsense way against that background understanding.’).
“Here, the ERS—a public pension plan—can be fairly characterized as ‘part of the compensation package that [the City] dangle[s] to attract and retain qualified employees.’ See McGrath, 88 F.3d at 17. Pensions are thus ‘regarded as a species of unilateral contracts.’ Id.; see Bd. of Trs. of the Policemen’s & Firemen’s Ret. Fund v. Cary, 373 So.2d 841, 842 (Ala.1979) (per curiam) (‘We analogize [a public pension program] to a unilateral contract....’). That is, ‘the promise of a pension constitutes an offer which, upon performance of the required service by the employee[,] becomes a binding obligation.’ McGrath, 88 F.3d at *646 17 (alteration in original) (quoting Hoefel v. Atlas Tack Corp., 581 F.2d 1, 4 (1st Cir.1978)).
“The Alabama Supreme Court has made clear that once employees ‘have served and retired, the benefits to which they are entitled' may not be reduced subsequent to their retirement absent an express reservation of a right to amend at any time.’ Cary, 373 So.2d at 842. In the State of Alabama, then, contractual rights to retirement benefits accrue when .employees have fulfilled their end of the bargain. For firefighters, this means performing ten years of creditable service and upon their reaching the age of retirement, or, alternatively, performing twenty-five years of creditable service, regardless of their age. See Ala. Code [1975,] § 36-27-16(a)(1). Until that time, however, employees’. interests in the retirement plan are ‘subject to legislative modification.’ Cary, 373 So.2d at 843.
“Plaintiffs argue that • Gadsden firefighters who have complied with the statutory requirements possess a ‘vested’ right to a 6% employee contribution rate. This argument relies on the assumption that there exists an implied promise not to’ raise the employee contribution rate once a firefighter becomes eligible for retirement benefits. We can find neither hide nor hair of such a promise.
“To begin, nothing in the text of Alabama Code [1975,] § 36—27[,] suggests that the employee contribution rate is immune from change, even after' an employee’s retirement benefits have vested. Employee contribution rates, moreover, were, amended several times , before plaintiffs joined the ERS. And it is well established that ‘the pervasiveness of .., prior regulation in [an] area suggests that[,] absent some affirmative indication to the contrary,’ the most recent modification will not necessarily be the last. Nat’l R.R. Passenger Corp., 470 U.S. at 469, 105 S.Ct. at 1453. Indeed, by our count, the contribution rate for various classes of ERS participants has been amended at least six times over the course of several decades. ... When deciding whether to join the ERS, the former [Policemen’s and Firemen’s Retirement Fund of the City of Gadsden] members were on notice of these prior increases, including an increase only one year before, which applied specifically to firefighters. Plaintiffs also had access to the 2002 ERS employee handbook when choosing whether to accept Gadsden’s offer to change the terms of their pension. This handbook explicitly stated that the ‘member contribution rate is .determined by statute and subject to change by the Alabama Legislature.’ ... Taken together, this evidence indicates that whateyer contractual terms preside over the employment relationship between the City and its firefighters, a promise to refrain from raising contribution rates is not one of. them.
“Plaintiffs challenge this conclusion by pointing to Alabama Supreme Court precedent holding that pension benefits, once vested, cannot be reduced by subsequent legislation. ... Their reliance on this line of precedent is misplaced. Nothing in the reasoning of these cases suggests that every pension provision is rendered immutable once an employee becomes eligible to retire. To the contrary, the Alabama Supreme Court has selectively extended such protection only to benefits promised by the employer for which the employee has satisfied all the conditions precedent. See, e.g., Cary, 373 So.2d at 842 (‘[W]here the promisee has completely performed all' of the obligations and all conditions precedent ... the promisor has an unqualified, duty to *647 pay those obligations.’); Snow v. Abernathy, 331 So.2d 626, 631 (Ala.1976) (‘Snow’s contractually vested right was to receive all benefits “contracted” for .... By electing, expressly or by assent, to participate in such plan employees acquire vested rights of contract to the benefits provided therein upon acceptance of the plan.’); Smith v. City of Dothan, 279 Ala. 571, 576,188 So.2d 532, 536 (Ala.1966) (per curiam) (‘[U]pon reaching eligibility for retirement ... [the employee] acquired a vested right to the benefits provided by [the pension program] free of the amendatory effect of [subsequent legislation].’).”
767 F.3d at 1133-35. See also American Fed’n of Teachers v. State, 167 N.H. 294, 304, 111 A.3d 63, 72 (2015) (applying National R.R. Passenger Corp. analysis and .concluding that there was nothing in the relevant New Hampshire pension statute that would “demonstrate an unmistakable intent by the legislature to bind itself against prospectively changing the definition of ‘earnable compensation’” in that statute).
Having reviewed the relevant statutes governing the ERS plan, we .conclude that there is nothing within those statutes that would indicate that the legislature intended to contractually bind itself to any definition of “earnable compensation” that would include overtime payments. Most notably, until May 2012 the definition of “earnable compensation” in § 36t27-1(14) made no mention of overtime payments and, as explained supra and in the August 2011 attorney general’s opinion, the language used in fact indicates that overtime payments were not “earnable compensation.”
The omission of any discussion of overtime payments from § 36-27-1(14) until the amendment to that statute in 2012 also distinguishes this case from the other cases relied upon by the police plaintiffs. In Smith, Snow, and Cary, and Blackwell and Roberts, the- Alabama and Tennessee state legislatures, respectively, had enacted statutes implementing specific pension rules and, some years later, passed new acts amending those same rules. Thus, had those cases arisen post-National R.R. Passenger Corp., the plaintiffs would have at least been able to point-to the earlier pre-amendment statutes as some- evidence of the legislatures’ previous intent. However, with regard to the September 2011 change in the way overtime payments were treated by the ERSA, the police plaintiffs cannot identify any statute that was amended to their detriment; rather, they object only to a change in an administrative interpretation of a statute. In Boswell v. Abex Corp., 294 Ala. 334, 336, 317 So.2d 317, 319 (1975), this Court stated:
“The correct rule is that an administrative interpretation of the governmental department for a number .of years is entitled to favorable consideration by the courts; but this rule of construction is to be laid aside where it séems reasonably certain that the administrator’s interpretation has been erroneous and that a different construction is required by the language of the statute. State v. Wertheimer Bag Co., 253 Ala. 124, 43 So.2d 824 [ (1949) ]; Drennen Motor Co. v. State, 279 Ala. 383, 185 So.2d 405 [ (1966) ]; East Brewton Materials, Inc. v. State Department of Revenue, 45 Ala.App. 584, 233 So.2d 751 [ (1970) ].
“Taxpayers have no vested right to rely upon an erroneous, interpretation of the statute exempting them from taxation, and under Section 100 of the Constitution of Alabama of 1901, the taxing authority has no .discretion in a matter of this kind. The reason for this rule is that in the assessment and collection of taxes, the State is acting in its governmental capacity, and it cannot be es- *648 topped with reference to the enforcement of taxes, even when the taxpayer was advised that it was not responsible for a tax.”
See also Faust v. Metropolitan Government of Nashville, 206 S.W.3d 475, 493 (Tenn.Ct.App.2006) (“Parties cannot gain vested rights in an erroneous interpretation by an administrati[ve] agency of a legislative act”). Thus, not only does the language of pre-amendment § 36-27-1(14) defeat any suggestion that the legislature intended to bind the State to a definition of “earnable compensation” that included overtime payments, but the ERSA’s longtime erroneous interpretation of § 36-27-1(14) also fails to bind the State in any respect.
Finally, we note that § 22 bars the legislature from enacting “any law” impairing the obligations of contracts. As noted in the preceding paragraph, however, to the extent the police plaintiffs are challenging ERSA’s September 2011 policy change, they are challenging the way the State defendants interpret § 36-27-1(14)—not a “law” amending § 36-27-1(14). This distinction effectively renders § 22 inapplicable. As the United States Court of Appeals for the Eleventh Circuit explained in Taylor: “Lost in the fog of litigation, this undisputed point bears emphasis: the [pension change] stems from a resolution by the City of Gadsden in 2011 .... And the City of Gadsden’s decision ... did not involve an ordinance or a similar act bearing the imprimatur of the State’s legislative authority.” 767 F.3d at 1132 (footnote omitted). Accordingly, the Taylor court concluded, “the plaintiffs [had] no basis upon which to launch a Contract Clause challenge in the first instance.” Id. at 1133. See also New Orleans Waterworks Co. v. Louisiana Sugar-Refining Co., 125 U.S. 18, 30, 8 S.Ct. 741, 31 L.Ed. 607 (1888) (“In order to come within the provision of the constitution of the United States which declares that no state shall pass any law impairing the obligation of contracts, not only must the obligation of a contract have been impaired, but it must have been impaired by a law of the state. The prohibition is aimed at the legislative power of the state, and not at the decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals.” (emphasis added)).
For all these reasons, the police plaintiffs’ argument that the State defendants’ interpretation of pre-amendment § 36-27-1(14) following the issuance of the August 2011 attorney general’s opinion violates § 22 of the Alabama Constitution for allegedly infringing upon their contractual rights is without merit. The State defendants properly applied § 36-27-1(14) when changing the ERSA policy regarding overtime payments following the issuance of the August 2011 attorney general’s opinion, and the State defendants were entitled to a judgment in their favor on the claims asserted by the police plaintiffs in this regard.
•IV.
The police plaintiffs also argue that the State defendants’ interpretation of § 36-27-1(14) subsequent to the legislature’s 2012 amendment of the statute is mistaken, and they accordingly ask this Court to declare the meaning of the term “annual base compensation” in the amended statute, which term, they argue, should include overtime payments received for overtime work the Auburn police officers are required to perform. Section 36-27-1(14) as amended continues to define “earnable compensation” as “[t]he full rate of compensation that would be payable to an employee if he or she worked the full normal work-time,” but it also specifically provides that, for Tier I members, earna-ble compensation “shall include overtime *649 payments that are made to a member; however, earnable compensation shall not exceed 120 percent of any members’ annual base compensation as certified by the employer.” The police plaintiffs argue that they are regularly required to work more than 40 hours per week and that they face disciplinary action if they refuse to do so. Accordingly, they argue, their “annual base compensation” should include those overtime payments they receive for this required overtime. They further note that several other states have considered similar cases and have held that police officers and other public employees are entitled to receive pension benefits based on overtime routinely worked as a normal part of their duties. See, e.g., Palyok v. Borough of West Mifflin, 526 Pa. 324, 328, 586 A.2d 366, 368 (1991) (holding that police officer was entitled to retirement benefits based on total compensation received, including overtime pay, inasmuch as the work he performed in exchange for the overtime pay was the same as the work he performed in exchange for his basic salary); Vogt v. City of New Orleans, 208 So.2d 420, 422 (La.Ct.App.1968) (holding that municipality was required to allow retirement contributions on eight hours of weekly “overtime” police officers were regularly scheduled to work); and Smith v. Lowell, 334 Mass. 516, 519, 136 N.E.2d 186, 188 (1956) (holding that “[t]he plaintiffs retirement allowance should be calculated from his actual compensation if regularly fixed and paid,” even if some of that compensation was denominated “overtime”).
Regardless, however, of decisions of other courts interpreting the statutes and rules governing the public pension plans in their respective states, we are bound by the language of the statute's governing the ERS plan. The only statute relevant to the police plaintiffs’ argument on this point is § 36-27-1(14), and we cannot agree with their argument that the term “annual base compensation” in that statute is ambiguous or vague and should be read to include overtime payments for overtime they are required to work. As discussed above, before its amendment in 2012, § 36-27-1(14) did not specifically address overtime payments, and the ERSA accordingly applied its own interpretation of the statute in determining whether overtime payments should be included within earnable compensation. The 2012 amendment, however, clarified that earnable compensation “shall include overtime payments that are made to an employee; however, earnable compensation shall not exceed 120 percent of any employee’s annual base compensation as certified by the employer.” We must give these words their plain and ordinary meaning, and, reading the statute as a whole as we are required to do, State Superintendent of Education v. Alabama Education Ass’n, 144 So.3d 265, 272-73 (Ala.2013), we conclude that, in amending. § 36-27-1(14), the legislature intended to allow only limited overtime payments to be included within a member’s fearnable compensation. Including overtime payments for mandatory overtime within a member’s “annual base compensation” would frustrate that-intent because it would effectively give the established limit no field of operation; that is, if overtime payments are included within a member’s “annual base compensation,” the 120 percent limit would never be reached, and there would effectively be no limit. Had the legislature intended to create some- distinction between mandatory overtime and voluntary overtime it could have done so; howevér, it did not, ■ instead speaking only of “overtime”' generally. This Court must accordingly refrain from creating such a distinction of our own accord. See, e.g., Noonan v. East-West Beltline, Inc., 487 So.2d 237, 239 (Ala.1986) (“It is not proper for a court to read into the statute something which *650 the legislature did not include although it could have easily done so.”).
The police plaintiffs have' identified' no' ambiguity or vagueness in § 36-27-1(14). When the legislature amended § 36-27-1(14) in 2012 to include overtime payments within the meaning of earnable compensation, it explicitly provided .that earnable compensation could not exceed 120 percent of annual base compensation, thus evinciiig an intent to allow only limited amounts of overtime to be counted for retirement purposes. The State defendants’ interpretation and application of § 36-27-1(14) subsequent to its 2012 amendment is consistent with the language of the statute and gives effect to the legislature’s intent.
V.
The police plaintiffs sued the State defendants seeking a declaratory judgment and injunctive relief requiring the ERS to allow its members to make retirement contributions based upon their “earnable compensation,” which term, the police plaintiffs argue, should include all payments received for mandatory overtime worked. However, because “earnable compensation” is defined in § 36-27-1(14) as that compensation received for -working “the full normal work-time,” we agree with the State defendants that, before the amendment of § 36-27-1(14) in 2012, earnable compensation did not properly include overtime payments—regardless of .the past practice of the ERSA.. Moreover, although the 2012 ■ amendment to § 36-27-1(14) allows overtime payments to be included within earnable compensation to a limited extent—-so long as earnable compensation does not exceed 120 percent of annual base compensation—we find no support in. the language of the statute for the police plaintiffs’ argument that the legislature intended to differentiate between mandatory overtime and voluntary overtime and to make mandatory overtime part of a member’s, annual base, compensation and thus not subject to the 120 percent limit. In sum, the Státe defendants have properly interpreted § 36-27-1(14) after its 2012 amendment. For these reasons, the summary judgment entered in favor of the State defendants is hereby affirmed.
1160265—AFFIRMED.
1150360—AFFIRMED.
, Stuart, Bolin, Parker, Shaw, and Wise, JJ., concur. .

. The RSA administers the ERS, the Teachers’ Retirement System of Alabama, and the Judicial Retirement Fund of Alabama.

. Some county, municipal, and quasi-public entities have elected to have their employees participate in the ERS plan.

. Members who began their employment in a position requiring them to enroll in the ERS plan (or any other RSA-administered plan) ' before January 1, 2013, are considered "Tier I” members, while members that began their employment on or after January 1, 2013, are considered "Tier II" members. The contribution rates, calculation of benefits, and certain other aspects of the ERS plan are different for the two tiers; however, because the instant action involves only Tier I members, all general discussion of the ERS plan in this opinion relates to Tier I. Benefits and minimum retirement ages are also different for members who are State police officers; however, the Auburn police officers are municipal police officers—not State police officers—and this opinion accordingly does not address those aspects of the ERS plan that are unique to State police officers.

.A vested member who is forced to retire early as a result of a permanent disability is entitled to disability-retirement benefits calculated in the same manner as standard retirement benefits; thus, in this opinion, reference to “retirement benefits” should be generally understood to also include disability-retirement benefits.

. Section 36-21-2, Ala. Code 1975, provides that certain State law-enforcement officers shall receive a subsistence -allowance each day they work that is not subject to any state or federal taxes. That amount is currently set at $12.

. Pursuant to § 36-27-1(15); Ala, Code 1975, the only compensation that can be included when calculating a member’s average final compensation upon retirement is that compensation upon which the member .made contributions; thus, preventing members from making contributions on overtime payments effectively excludes that pay from being considered when the members' retirement benefits are calculated as well. However, because contributions were made on overtime payments received before September 2011, those overtime payments are still included- when calculating a member's average final compensation, notwithstanding the subsequent change in policy regarding the treatment of overtime payments.

. The State defendants argue to this Court that the SSPBA has no standing to join the Auburn police officers in this action. The police plaintiffs, however, cite Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 783 So.2d 792, 795 (Ala.2000), for the principle that an association has standing to sue on behalf of its members when it seeks relief that will inure to the benefit of those members. We agree thatthe SSPBA has standing under the test adopted by this Court in Bama Budweiser and reject the State defendants’ argument challenging the SSPBA's participation in this case. Moreover, it is undisputed that the Auburn police officers -have standing; thus,, this action would proceed with or without the SSPBA. See City of Tuscaloosa v. Alabama Retail Association, 466 So.2d 103, 107 (Ala.1985) (rejectin¿ appellant’s challenge to trade association’s standing to participate in case and affirming judgment entered by the trial court where it was undisputed that co-plaintiffs, who were members of the trade association, had standing).

.A subsequent amendment to § 36-27-1(14), ' effective January 1, 2013, limited the provision capping a member’s earnable compensation at 120% of his or her annual base compensation to Tier I members, while capping the earnable compensation of Tier II members at 125% of their annual base compensation.

. The plaintiffs in those other cases eventually agreed to the dismissal of their cases, thus allowing the legality of the State defendants’ actions to be resolved in the context of this ‘ case. ‘

. Officers Kendall and McCulloch were vested members in September 2011; Officer Carver was not.

. What the police plaintiffs refer to as "the Tennessee rule” is referred to by the Supreme Court of Tennessee in Blackwell as "the Pennsylvania rule,” because the rule appears to have its origin in Harvey v. Retirement Board of Allegheny County, 392 Pa. 421, 431, 141 A.2d 197, 203 (1958) (stating that "[a]n employee who has complied with all conditions necessary to receive a retirement allowance 'cannot be affected adversely by subsequent legislation which changes the terms of the retirement contract”).

. This Court has recognized that the state contracts clause in § 22 of the Alabama Constitution has the same purpose as the federal contracts clause in Article I, § 10 of the United States Constitution, and courts have generally applied the same analysis to claims asserting violátions of either clause. Opinion of the Justices No. 333, 598 So.2d 1362, 1365 (Ala.1992). See also Storer Cable Commc'ns v. City of Montgomery, 806 F.Supp. 1518, 1551 (M.D.Ala.1992) (noting that "[a]lthough the case law interpreting [§ 22] is extremely scarce, it seems reasonably clear that the Supreme Court of Alabama gives the clause much the same meaning as the federal courts have given the national clause”).